1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   BRUCE THORNS,

11          Plaintiff,              No. 2:11-cv-01826 MCE DAD P

12     vs.

13   S. SHANNON, et al.,

14          Defendants.          FINDINGS & RECOMMENDATIONS

15   _____/

16          Plaintiff, a former state prisoner, is proceeding pro se with a civil rights action

17   pursuant to 42 U.S.C. § 1983.  Plaintiff is currently incarcerated at La Palma Correctional Center

18   in Eloy, Arizona.  Before the court is the motion for summary judgment filed on behalf of

19   defendants Correctional Capt. S. Shannon, Warden Tim Virga, and Correctional Lt. J.A. Baker.

20   Plaintiff has filed an opposition to the motion and defendants have filed a reply.  Following the

21   decision in Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), on September 19, 2012, the court

22   issued an order again advising plaintiff with respect to the requirements for opposing a motion

23   for summary judgment such as that now pending before the court and granted plaintiff leave to

24   file a supplemental opposition.  (Doc. No. 29.)  Thereafter, and after both parties were granted

25   extensions time to do so, plaintiff filed a supplemental opposition to the motion and defendants

26   /////

1  filed a supplemental reply.[1]

2  **COMPLAINT**

3  In his complaint naming the three defendants who have now moved for summary

4  judgment, plaintiff alleges as follows.  Plaintiff was incarcerated at California State Prison -

5  Sacramento (CSP-Sacramento) where all three defendants were employed.  On September 7,

6  2010, plaintiff and other African-American inmates, as well as Northern Hispanic inmates, were

7  placed on lockdown following an attack on an African-American inmate by Northern Hispanic

8  inmates. (Doc. No. 1 at 3.)  On September 30, 2010, black inmates housed in cell blocks 5

9  through 8 were placed on a "SHU program" with no yard, telephone calls, visits, religious

10  services, canteen, and other program limitations.  (Id.)  As of July 8, 2011, when plaintiff signed

11  his civil rights complaint, he remained on this SHU program status.  (Id.)  On December 6, 2010,

12  plaintiff was interviewed concerning an inmate appeal he had filed in this regard and defendant

13  Baker told plaintiff that only black inmates in C-facility who are Crips, Bloods and Northern

14  Hispanics housed in blocks 5 through 8 would remain on lockdown.  (Id. at 4.)  Although

15  plaintiff found a cell in block 3 where he could be moved to, defendants Shannon and Baker

16  would not allow him to move out of block 8.  (Id.)  White paint covered a window in the cell

17  where plaintiff was housed, thereby denying him lighting.  (Id.)  A review of plaintiff's central

18  medical file would show that he has "serious medical needs that require outdoor exercise and

19  fresh air[.]"  (Id.)

20  Based upon these allegations, plaintiff seeks the following relief:

21  I am asking this court to stop Warden Tim V. Virga, Captain S.
    Shannon, and Correctional Lieutenant J.A. Baker from placing me
22  and other inmates on lockdowns that are of the same black race but
    different groups, and from different areas in the state or on the
23  same yard but live in different blocks on the same yard.  Also, I am

24  _____

25  [1]  Counsel for defendants has also filed fifteen pages of objections, purportedly to
    evidence presented by plaintiff in his supplemental opposition.  (Doc. No. 42.)  The court has
    considered all of the pro se plaintiff's submissions in arriving at the recommendation set forth
26  herein and overrules the defendants' various objections.  to file their supplemental reply.

1   a asking this court to order the removel [sic] of the white paint off
    the back cell windows.  And, plaintiff ask this court to order
2   defendants to pay $1.50 for each day illegally locked downed [sic].

3   (Id. at 3.)

4               SUMMARY JUDGMENT STANDARDS UNDER RULE 56

5          Summary judgment is appropriate when it is demonstrated that there exists "no

6   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7   matter of law."  Fed. R. Civ. P. 56(c).

8          Under summary judgment practice, the moving party

9          always bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
10         pleadings, depositions, answers to interrogatories, and admissions
           on file, together with the affidavits, if any," which it believes
11         demonstrate the absence of a genuine issue of material fact.

12  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

13  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

14  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

15  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

16  after adequate time for discovery and upon motion, against a party who fails to make a showing

17  sufficient to establish the existence of an element essential to that party's case, and on which that

18  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

19  concerning an essential element of the nonmoving party's case necessarily renders all other facts

20  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

21  whatever is before the district court demonstrates that the standard for entry of summary

22  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

23         If the moving party meets its initial responsibility, the burden then shifts to the

24  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26  establish the existence of this factual dispute, the opposing party may not rely upon the

3

1  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

2  form of affidavits, and/or admissible discovery material, in support of its contention that the

3  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

4  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

5  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

6  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

7  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

8  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

9  1436 (9th Cir. 1987).

10  In the endeavor to establish the existence of a factual dispute, the opposing party

11  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

12  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

13  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

14  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

15  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

16  committee's note on 1963 amendments).

17  In resolving the summary judgment motion, the court examines the pleadings,

18  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

20  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

21  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

22  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

23  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

24  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

25  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

26  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

4

1   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

2   'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

3            As noted above, On August 22, 2011 and again on September 19, 2012, the court

4   advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal

5   Rules of Civil Procedure.  <u>See</u> <u>Woods v. Carey</u>, 684 F.3d 934 (9th Cir. 2012): <u>Rand v. Rowland</u>,

6   154 F.3d 952, 957 (9th Cir. 1998) (en banc); <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir.

7   1988).

8                    **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

9            Defendants move for summary judgment in their favor on the grounds that none

10  of them have violated plaintiff's right to equal protection under the laws and because they are

11  entitled to qualified immunity.

12  **I.      Defendants' Evidence**

13           In moving for summary judgment in their favor, defendants have presented

14  evidence of the following.

15       **A.  Gang Violence in Prison Along Racial and Ethnic Lines**

16           Defendant Virga has been employed with the California Department of

17  Corrections and Rehabilitation (CDCR) for approximately 29 years and has been the Warden of

18  CSP-Sacramento since May 9, 2011.  (Doc. No. 21-6 (Virga Decl.) ¶ 1 at 1.)  Before becoming

19  the Warden, he was the acting and Chief Deputy Warden for approximately four years.  (<u>Id.</u>)

20  Defendant Virga declares as follows.  Violence in prison is often race or ethnicity-based.  (<u>Id.</u> ¶ 3

21  at 2.)  Inmates often segregate themselves by race and form violent gangs along racial or ethnic

22  lines.  (<u>Id.</u>)  Even inmates who are not affiliated with a gang are sometimes pressured by gang

23  members to assist them in violent activities.  (<u>Id.</u> ¶ 4 at 2.)  Sometimes incidents that begin

24  without racial animus evolve into a racial conflict as inmates of a racial group interpret an

25  incident as calling for retaliation against members of a participant's racial group.  (<u>Id.</u>)

26  /////

1    Defendant Shannon, who was the Facility Captain for C Facility at CSP-

2    Sacramento at the time of the events in question, has submitted a declaration in which he

3    expresses his agreement  with defendant Virga' declaration as to the composition, nature and

4    behavior of prison gangs and disruptive groups.  (Doc. No. 21-5 (Shannon Decl.) ¶ 2 at 1-2.)

5    **B.  September 7, 2010 Assault**

6    On September 7, 2010, two Northern Hispanic inmates stabbed an African-

7    American inmate at the C Facility of CSP-Sacramento.  (Virga Decl. ¶10 at 4.)  The assailants

8    initially refused to stop the assault despite orders by correctional officers to do so and pepper

9    spray was used to halt the assault.  (Id.)  The victim received stab wounds to the head, neck, chest

10   and elsewhere.  (Id.)  Because of the use of weapons, repeated stab wounds inflicted and the

11   inmates' refusal to stop when ordered to do so, executive staff and defendant Virga determined

12   that the attackers had tried to murder the African-American inmate.  (Id.)  Defendant Virga

13   suspected this incident may have been related to an earlier incident in C- facility that occurred in

14   March 2010, during which an African-American inmate stabbed a Northern Hispanic inmate.

15   (Id. ¶¶ 9 & 11 at 4.)  It was rumored at that time that Northern Hispanic inmates would take

16   retaliatory action because the Crips had failed to deal with the attacker who had been re-housed

17   in administrative segregation and single-celled.  (Id. ¶ 9 at 4.)

18   In his declaration, defendant Shannon states that he could not be certain if the

19   September 7, 2010 incident was in retaliation for the March 2010 incident, although that was a

20   real possibility.  (Shannon Decl. ¶ 4 at 2.)  Defendant Shannon also states that there was concern

21   over whether the September 7th attack would lead to other retaliatory violence and whether such

22   retaliation by inmates would be long racial lines.  (Id.)

23   **C.  Security Measures Taken after September 7 Incident**

24   The attackers and victim involved in the September 7, 2010 incident were

25   immediately separated from the general population and re-housed in administrative segregation.

26   (Virga Decl. ¶ 13 at 5.)  The attackers were charged with attempted murder.  (Id.)

African-American and Hispanic inmates in C Facility, cell block 5-8, were placed on modified program pending an investigation into the stabbing and due to the potential for further violence.  (Id. ¶ 14 at 5.)  Inmates belonging to other racial groups, as well as, African-American and Hispanic inmates in other cell blocks on Facility C and other facilities, were not placed on modified program.  (Id.)  Defendant Virga provides the following explanation for that decision:

> By instituting a modified program only in the cell block where the incident occurred, and only for inmates who might initiate or be subjected to racially-motivated violence, I was trying to safeguard the safety and security of the inmates, staff, institution, and general public, while restricting the regular programming of the fewest number of inmates.

(Id.)

According to defendant Warden Virga, modified program imposed the following restrictions on the inmates subject thereto:

> [N]o visiting, no yard, controlled and restrained showers (escorted in restraints), all escorts in restraints, and no simultaneous movement of African-American or Northern Hispanic inmates within the facility.  This did not affect meals, because at CSP-Sacramento, all inmates are fed at their cells, even during times of regular programming.

(Id. ¶ 15 at 5.)  Defendant Virga met with his executive staff frequently to evaluate the status of the modified program and to formulate a plan for the eventual return to normal programming. (Id. ¶6 at 3.)

Staff began investigating the causes of the attack on September 7, 2010.  (Id. ¶ 16 at 5.)  It was discovered that on the day of the incident and just before it occurred, an unidentified inmate affiliated with the Northern Hispanics told an African-American inmate not affiliated with the Crips, not to go into the dayroom where the incident occurred because of a "'Crip thing.'"  (Id. ¶16 at 6.)

/////

### D.  Continuation of the Modified Program

Confidential interviews of all African-American and Northern Hispanic inmates housed in blocks 5-8 by correctional staff began the day after the incident.  (Id. ¶ 17 at 6.)  Cell searches in blocks 5-8 by correctional officers began on September 12, 2010.  (Id. ¶ 18 at 6.)

Throughout the fall of 2010, defendant Warden Virga determined from available evidence that there was a high risk of violence between racial groups if African-American and Northern Hispanic inmates were returned to normal programming.  (Id. ¶ 32 at 8.)  That determination was based on the following information.

On September 19, 2010, correctional officers discovered an anonymous note stating that African-American inmates on C-Facility would attack any Northern Hispanic inmates who were released on job assignment in a specific area of the prison.  (Id. ¶ 21 at 6.)

On September 21, 2010, a correctional officer reported that a confidential source had informed him that African-American inmates in blocks 1-4 intended to smuggle weapons to African-American inmates in blocks 5-8 who were associated with the Crips.  (Id. ¶ 22 at 7.)

On September 24, 2010, an inmate mentioned to a correctional officer that there were bad "'business deals'" between Northern Hispanic and Crip inmates.  (Id. ¶ 23 at 7.)  Another correctional officer learned from a different inmate that Northern Hispanic and African-American inmates intended to attack each other on sight.  (Id.)

On October 2, 2010, during a contraband watch, three kites[2] were obtained by correctional officers from inmates which ordered Northern Hispanic inmates to be armed.  (Id. ¶ 24 at 7.)  On that same day, two other kites were discovered by correctional officers during a search of a cell occupied by two inmates associated with the Crips.  (Id.)  Those kites stated that if African-American inmates returned to normal programming, they would go back to modified programming because they would attack Northern Hispanic inmates.  (Id.)

---

[2]  In his declaration defendant Warden Virga explains that such "kites" are "written, covert communications between inmates[.]"  (Virga Decl. ¶ 24 at 7.)

On October 11, 2010, interviews by correctional officers with inmates revealed that Northern Hispanic inmates had a roster of Southern California Crips and that a "green light" had been given to them to attack all Southern California Crips.  (Id. ¶ 25 at 7.)

In mid-October 2010, a white inmate mistaken for a Northern Hispanic inmate was stabbed by an African-American inmate.  (Id. ¶ 26 at 7.)

On November 6, 2010, a door was inadvertently left open by correctional staff and there was an altercation between four African-American inmates and two Northern Hispanic inmates in the dayroom in the 5 block of C Facility.  (Id. ¶ 28 at 7.)  Two of the African-American inmates were associated with the Crips and the other two were associated with the Bloods.  (Id.)  Defendant Warden Virga notes that cooperation between inmates who are Crips and Bloods is unusual and that this disturbance indicated that the animosity that existed in blocks 5-8 was not confined to particular disruptive groups, but was racial in nature.  (Id. ¶ 28 at 7-8.)

On November 9, 2010, a confidential source informed a correctional officer that Northern Hispanic inmates on C Facility were to be armed at all times and that they had a "green light" to attack all Southern California Crips and Bloods.  (Id. ¶ 29 at 8.)

On December 1, 2010, two Northern Hispanic inmates stabbed an African-American Crip inmate in the rotunda in the C-7 block of C Facility.  (Id. ¶ 31 at 8.)  Defendant Warden Virga notes that the fact that Northern Hispanic inmates were armed and ready to attack an African-American inmate indicated that it was not safe to lift the modified program in its entirety at that time.  (Id.)

### E.  Releasing Inmates from Modified Programming

Defendant Virga states that when it became apparent that the tensions that led to the September 7, 2010 stabbing incident would not be easily resolved, he authorized a scoring system to be used in identifying inmates who presented a safety and security threat to the institution.  (Virga Decl., ¶ 34 at 8.)  The scoring system worked in the following way:

/////

> Inmates were assigned points for various risk factors, such as their history of violence, age, geographic background, and affiliation with gangs or disruptive groups. Race or ethnicity was not a factor in assigning points. Inmates were then grouped into six categories, according to their scores. Category one contained the inmates with the lowest scores, and who therefore presented the least security risk. Category six contained the inmates with the highest scores, who therefore presented the highest security risk. In addition, all inmates in Block 5-8 were interviewed before their category assignments were finalized, in order to ensure there were no risk factors previously unknown to prison officials.

(Id. ¶ 34 at 8-9.)

From November 8, 2010 through November 24, 2010, the scoring system was implemented and involved reviewing the central files of 350 inmates along with the conducting of inmate interviews. (Id. ¶ 35 at 9.) Defendant Warden Virga explains that he "thought the scoring system might be an effective way to lift the restrictions of the modified program for African-American inmates not affiliated with the Crips or Bloods, without endangering institutional safety." (Id.)

Beginning the week of November 29, 2010, twenty of the lowest-risk African-American inmates were scheduled for release to normal programming, with an additional release of twenty inmates each week thereafter. (Id. ¶ 36 at 9.) The idea behind this gradual release plan was to ease racial hostilities and to reduce the incentive for higher-risk inmates to foment violence because their peers would wish to preserve the privileges associated with normal programming. (Id.) By January 6, 2011, one-hundred and five low and medium risk African-American inmates had been released back to normal programming. (Id. ¶ 38 at 10.)

Throughout the spring of 2011, defendant Virga continued to receive conflicting information about the conflict between Northern Hispanic and African-American inmates. (Id. ¶ 39 at 10.) During the week of April 4, 2011, correctional staff conducted comprehensive interviews with inmates who remained on modified programming. (Id. ¶ 40 at 10.) While the majority of Crips, Bloods and Northern Hispanic inmates said they could return to normal programming without violence, some inmates refused in whole or in part to be interviewed by

1   correctional staff at that time.  (Id.)

2          By April 12, 2011, the only inmates remaining on modified programing were

3   Northern Hispanics and African-American inmates who were associates of Crips or Bloods.  (Id.

4   ¶ 41 at 10.)  During that month, Crips/Bloods were allowed to exercise on the management yard,

5   as were Northern Hispanics, but not at the same time.  (Id. ¶ 42 at 10.)  Eventually, small and

6   equal numbers of both groups were released on the yard together.  However, on April 28, 2011,

7   another fight occurred between a Northern Hispanic inmate and a Crip inmate.  (Id. at 11.)

8          Throughout April and May of 2011, limited releases of the effected inmates to the

9   yard continued without incident.  (Id. ¶ 43 at 11.)  However, on June 3, 2011, correctional staff

10  assigned to the yard discovered a stabbing weapon in the rectum of a Northern Hispanic inmate.

11  (Id.)  Thereafter, Northern Hispanic inmates met with defendant Capt. Shannon, but refused to

12  tell him why a weapon had been brought to the yard and refused to discuss options to resolve

13  issues between them and the Crips/Bloods inmates.  (Id.; Shannon Decl. ¶ 9 at 3.)

14          As a result, defendants Warden Virga and Capt. Shannon concluded that the

15  Northern Hispanic inmates remained unwilling to program peacefully in C Facility with Crips

16  and Bloods inmates.  (Virga Decl. ¶ 44 at 11; Shannon Decl. ¶10 at 3.)  Defendant Warden Virga

17  decided to continue gradually releasing Crips and Bloods inmates to normal programming, but

18  not to return the Northern Hispanic inmates to normal programming.  (Virga Decl. ¶ 44 at 11.)

19  Instead, in August 2011, all Northern Hispanic inmates in C Facility at CSP-Sacramento were

20  transferred to other institutions.  (Id. ¶ 45 at 11.)  After further investigation by correctional staff

21  resulted in a finding that the climate between Northern Hispanic inmates and Crips/Bloods

22  inmates had eased, C Facility finally returned in total to normal programming on September 6,

23  2011.  (Id.)

24          Defendant Capt. Shannon, as a member of the CSP-Sacramento executive staff,

25  consulted with defendant Warden Virga concerning the modified programming.  (Shannon Decl.

26  ¶ 3 at 2.)  Defendant Capt. Shannon reviewed the available intelligence information with

11

1   defendant Warden Virga at meetings and was in agreement  with the description of the nature and

2   progress of the modified programming as described in defendant Warden Virga's declaration

3   submitted in support of the pending motion for summary judgment.  (Id.)

4   **F.  Plaintiff's Status**

5   Defendants contend that plaintiff is a Crip gang member/inmate from Southern

6   California and that he had a history of engaging in prison violence prior to the September 7, 2010

7   incident.  (Virga Decl. ¶ 46 at 11; Shannon Decl. ¶ 11 at 3.)  Because of those factors, plaintiff

8   was assessed by prison officials to be in the high-risk category of inmates following the incident.

9   (Id.)  Plaintiff was eventually returned to normal programming on July 5, 2011.  (Id.)

10  **II. Defendants' Arguments**

11  Defendants assert that because racism is involved in the formation of prison gangs

12  and disruptive groups, prison officials cannot discharge their duties to keep inmates safe unless

13  "their eyes are open to these realities."  (Doc. No. 21-1 at 19.)  Defendant Warden Virga explains

14  that he placed the Northern Hispanics and African-American inmates from blocks 5-8 of C

15  Facility on modified programming after an attempted murder of an inmate, only because it was

16  necessary to determine whether further racial violence would ensue in the absence of a modified

17  program for inmates.  (Id. at 19-20.)  According to defendants these fears were justified based on

18  information acquired by prison officials which included information obtained in late December

19  2010 that Northern Hispanic inmates had issued a "1/2 sixty" on African-American inmates

20  (meaning that Northern Hispanic inmates were to be alert for an attack by African-American

21  inmates but not to attack on sight).  (Id. at 14 and 20.)

22  Defendants emphasize that modified programming was not implemented with

23  respect to all Northern Hispanic and African-American inmates.  (Id. at 20.)  Instead, the

24  response by prison officials in this instance was narrowly tailored so that only inmates in cell

25  block 5-8 of C Facility, where the stabbing incident had taken place, were affected.  (Id.)

26  Defendants also contend that they took measures to ease the restrictions that were imposed on

1   those inmates as quickly as possible.  (Id.)  In this regard, defendants note that:  by September 17,

2   2010, all African-American and Northern Hispanic inmates were escorted unrestrained, but not

3   together; by October 12, 2010, inmates in blocks 5-8 were issued personal property; and by

4   November 10, 2010, African-American and Northern Hispanic inmates in blocks 5-8 were

5   allowed limited access to the canteen for stationary and hygiene supplies.  (Id.)

6          Defendant's argue that the scoring system they utilized to assess the risk of

7   releasing individual inmates to normal programming was based on individual case factors and

8   that race was not one of those factors.  (Id.)  Defendants contend that by November 2010, when

9   inmates began being gradually released to normal programming according to their score, strict

10  scrutiny of their programming decisions is not warranted since by that time prisoners were being

11  classified based upon risk factors and not based upon their race.  (Id. at 21.)

12         Defendants assert that it is undisputed that plaintiff is a Crip gang member/inmate

13  and that he has been found guilty of participation in past prison violence.  (Id.)  Defendants

14  contend that it was plaintiff's continued participation in a violent group that caused him to be

15  subjected to modified programming for a longer period of time than some other inmates.  (Id.)

16  Defendants also argue that the modified program that was imposed, furthered the prison

17  administration's legitimate interest in limiting the danger posed to inmates and staff by two rival

18  disruptive inmate groups.  (Id.)  Defendants claim that the race-neutral scoring system was

19  employed to progressively narrow the reach of the modified programming to only the highest-

20  risk inmates and that their response to the September 7, 2010 stabbing incident was narrowly

21  tailored to serve the compelling government interest of maintaining inmate safety.  (Id.)

22         Defense counsel also argues that the evidence establishes that defendant Baker

23  was not even part of the prison's executive staff and did not have authority to impose, modify or

24  end the modified programming about which plaintiff complains.   (Id. at 22; Virga Decl. ¶ 47 at

25  12.)  Therefore, defense counsel argues, under the undisputed evidence before the court

26  defendant Lt. Baker is entitled to summary judgment in her favor because she did not violate

1 | plaintiff's civil rights.

2 |       Alternatively, defense counsel argues that all of the defendants are entitled to

3 | summary judgment in their favor on qualified immunity grounds.[3]

4 | **PLAINTIFF'S OPPOSITION**

5 |       In his opposition to the pending motion for summary judgment, plaintiff contends

6 | that his complaint presents more than just an equal protection claim.  Plaintiff asserts that as a

7 | result of being placed in, and retained on, lockdown status for the lengthy period of time in

8 | question he was also denied:  procedural due process; proper medical care; access to the law

9 | library; access to the courts; access to religious services; adequate lighting and sunlight; outdoor

10 | exercise; and his right to be free from cruel and unusual punishment.  (Doc. No. 25 at 2-9.)

11 | Finally, plaintiff contends that the defendants have failed to establish that they are entitled to

12 | qualified immunity.  (Id. at 8-9.)

13 | **PLAINTIFF'S SUPPLEMENTAL OPPOSITION**

14 |       In his supplemental opposition to the pending motion for summary judgment

15 | plaintiff asserts that defendants' "policy of race-based lockdowns and race-based released from

16 | modified program is premised upon an assumption, not supported by the evidence[.]"  (Doc. No.

17 | 34 at 9.)  Plaintiff contends that the defendants' inherent assumption is that inmates of a

18 | particular race will act as a united group to support a gang or disruptive group of  the same race.

19 | (Id.)  However, relying on defendants' own evidence, plaintiff argues that when African-

20 | American inmates not affiliated with the Crips or Bloods were released to normal programming

21 | in November 2010, there were no incidents of violence at CSP-Sacramento.  (Id.)

22 |       Plaintiff argues that the court should apply strict scrutiny in considering

23 | defendants' reliance on race for its lockdown and modified programming policies.  (Id. at 11.)

24 |

25 |    [3]  In light of the recommendation set forth below, the court finds it unnecessary to address this alternative argument advanced by defendants in support of their motion for summary

26 | judgment.

1    Plaintiff contends that the information relied on by defendant Warden Virga in reaching his

2    decision to continue the modified programming in this instance was either false or non-existent.

3    (Id. at 10.)  Plaintiff assets that the modified programming did not "limit the danger" between

4    rival prison groups because three months later, in December 2011, there were two more inmate

5    riots at CSP-Sacramento.  (Id. at 12.)  Lastly, plaintiff argues that the modified programming

6    imposed by the defendants was not narrowly tailored as they claim.  (Id.)

7         Plaintiff also contends that defendant Lt. Baker, is in fact part of the executive

8    staff at CSP-Sacramento and that as a supervisor, she had the authority to impose, modify or end

9    the modified programming.  (Id. at 18-19.)  In his declaration, plaintiff states that defendant Lt.

10   Baker has this authority because when the captain is "not on the yard, the Lieutenant is in

11   control." (Doc. No. 34-4 at 7.)

12        The remainder of plaintiff's supplemental opposition concerns his argument that

13   as a result of the challenged modified programming imposed by defendants, he was also denied

14   outdoor exercise, adequate lighting, and adequate medical care.  (Doc. No. 34 at 12-17.)  Plaintiff

15   repeats his assertion that the defendants are not entitled to qualified immunity.  (Id. at 19-21.)

16        In his declaration submitted in support of his supplemental opposition, plaintiff

17   states that he was not involved in the September 7, 2010 incident.  (Doc. No. 34-4, ¶ 12 at 3.)

18   Plaintiff attacks defendants' rationale and supporting evidence relied upon in implementing the

19   policies they employed in response to the September 7, 2010 incident.  Plaintiff points to other

20   incidents of inmate assaults where the modified programming response lasted for only a few

21   weeks.  (Id., ¶ 18 at 5.)  Plaintiff argues that defendants have adopted a policy that perpetuates a

22   "culture of separation" by allowing segregated yards and housing.  (Id., ¶ 21 at 6.)  Plaintiff

23   disputes the existence of "kites," confidential information and other evidence used by defendants

24   to justify the long-term lockdown of inmates employed in this instance.  (Id., ¶ 24 at 6-7 & 11-14.)

25   Plaintiff contends that defendants are "lying" about the racial membership of the Crips and Bloods

26   and the alleged "'green light'" order given to Northern Hispanics to attack African-American

15

1   inmates regardless of whether they were Crips or Bloods.  (Id., ¶¶ 34-36 at 10.)  Plaintiff contends

2   that by December 6, 2010, defendants knew that Northern Hispanic inmates were not willing to

3   program "with any race at CSP-Sacramento" and he challenges defendants' decision not to

4   transfer Northern Hispanic inmates out of CSP-Sacramento earlier.  (Id., ¶¶ 51 & 54 at 15.)

5   Plaintiff also asserts that he did not have a history of engaging in violence prior to September 7,

6   2010 and that in regard to his involvement in a May 3, 2010 incident referred to by defendants, he

7   was merely attempting to break-up a fight between other inmates.  (Id., ¶ 64 at 18.)  Plaintiff also

8   asserts that although he is a Crip inmate from Southern California, that should not cause

9   defendants to assess him "any higher risk-factors than other inmate on a high security prison

10   yard."  (Id., ¶ 65 at 18.)

11          Plaintiff's statement of undisputed and disputed facts is based entirely on the

12   allegations of his complaint and the declarations submitted by defendants Warden Virga and Lt.

13   Shannon in support of the defendants' motion for summary judgment.  (Doc. No. 34-1.)

14                                          **ANALYSIS**

15   **I. Equal Protection Claim**

16          A.  Legal Standards Governing an Equal Protection Claim

17          The Equal Protection Clause "is essentially a direction that all persons similarly

18   situated should be treated alike."  City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432,

19   439 (1985).  "To state a § 1983 claim for violation of the Equal Protection Clause ' a plaintiff

20   must show that the defendants acted with the intent or purpose to discriminate against the

21   plaintiff based upon membership in a protected class.'"  Thornton v. City of St. Helens, 425 F.3d

22   1158 1166 (9th Cir. 2005) (quoting Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir.

23   2001)).  "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment

24   from invidious discrimination based on race."  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

25   Where, as here, the state considered race as part of the modified programming decision, plaintiff

26   is not required to prove a discriminatory intent.  Walker v. Gomez, 370 F.3d 969, 974 (9th Cir.

1    2004).[4]

2          Actions by prison officials that rest on racial classifications are immediately

3    suspect and must be reviewed under the same strict scrutiny as racial classifications outside the

4    prison context.  Johnson v. California, 543 U.S. 499, 505, 508-10 (2005).  Under the strict

5    scrutiny standard, the government has the burden of proving that the racial classifications "are

6    narrowly tailored measures that further compelling governmental interests."  Id. at 505 (internal

7    quotation marks omitted).  Prison security, of course, is recognized as a compelling government

8    interest.  Greene v. Solano County Jail, 513 F.3d 982, 988 (9th Cir. 2008) (citing Cutter v.

9    Wilkinson, 544 U.S. 709, 725 n.13 (2005)).  Narrow tailoring requires that "the means chosen to

10   accomplish the [government's] asserted purpose must be specifically and narrowly framed to

11   accomplish that purpose."  Grutter v. Bollinger, 539 U.S. 306, 333 (2003) (internal quotation

12   marks and first alteration omitted) (alteration in original).  See also Johnson, 543 U.S. at 511-13,

13   515 (remanding for a determination of whether CDCR policy involving the temporary segregation

14   of inmates by race was narrowly tailored to serve a compelling state interest.")

15          When racial classifications are used in response to prison disturbances, prison staff

16   must show "that reasonable men and women could not differ regarding the necessity of a racial

17   classification in response to prison disturbances and that the racial classification was the least

18   restrictive alternative (i.e., that any race-based policies are narrowly tailed to legitimate prison

19   goals)."  Richardson v. Runnels, 594 F.3d 666, 671 (9th Cir. 2010) (concluding that prison

20   officials failed to carry their burden when they made no evidentiary showing that all African-

21   American inmates needed to be placed on lockdown when, at most, only a few African-American

22

23          [4] Normally, in order to state a viable claim under the Equal Protection Clause, a prisoner
     "must plead intentional unlawful discrimination or allege facts that are at least susceptible of an
24   inference of discriminatory intent."  Byrd v. Maricopa County Sheriff's Dep't, 565 F.3d 1205,
     1212 (9th Cir. 2009) (quoting Monteiro v. Tempe Union High School District, 158 F.3d 1022,
25   1026 (9th Cir. 1998)).  Such "[i]ntentional discrimination means that a defendant acted at least in
     part *because of* a plaintiff's protected status."  Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir.
26   2003) (quoting Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994)).

1   inmates were responsible for a staff assault).  See also Hernandez v. Cate, ___F. Supp.2d___,

2   2013 WL 210204, at * 11 (C.D. Cal. Jan 18, 2013).   Accordingly, the defendants here are entitled

3   to summary judgment if the undisputed evidence shows that the decision to put plaintiff on

4   modified programming on September 30, 2010 and not return him to normal programming until

5   July 5, 2011, was a "narrowly tailored measure[ ] that further[ed] compelling governments

6   interests."  Johnson, 543 U.S. at 505.

7        B.  Racial Classification and Compelling Governmental Interest

8             Based on these legal standards, plaintiff's equal protection claim alleging that all

9   African-American inmates, including himself, were placed on modified programming status after

10  an inmate assault, is subject to strict scrutiny under the Equal Protection Clause of the Fourteenth

11  Amendment.  This places a burden on defendants to demonstrate that their actions were narrowly

12  tailored to further a compelling governmental interests.  In this case, defendants argue that by

13  imposing the modified program, they were attempting to safeguard the safety and security of the

14  inmates, staff, institution and general public.  The undersigned concurs that in light of prior

15  hostilities between African-American and Northern Hispanic inmates at CSP-Sacramento and the

16  aggressive nature of the September 7, 2010 assault that preceded their response in this instance,

17  the defendant prison officials have demonstrated that there was a compelling state interest to

18  secure the prison from further violence between African-American and Northern Hispanic

19  inmates.  See Cutter, 544 U.S. at 725 n.13 (2005) ("It bears repetition . . . that prison security is a

20  compelling state interest, and that deference is due to institutional officials' expertise in this

21  area."); Haynes v. Sissto, No. CIV S-08-2177-SPG (PC), 2012 WL 6005701 at *7 (E.D. Cal. Nov.

22  30, 2012) (Graber, C.J. by assignment) ("The evidence unequivocally shows that the challenged

23  actions were directed toward alleviating racially-motivated violence between African-American

24  and Southern Hispanic inmates.  It is accordingly beyond dispute that the challenged actions were

25  directed toward the compelling interest of promoting prison security.") (internal citation omitted).

26  /////

1          C.  Was the Modified Programming Narrowly Tailored?

2                  Following the September 7, 2010, inmate attack at CSP-Sacramento, all African-

3     American and Northern Hispanic inmates housed in blocks 5-8 of C-facility were placed on

4     modified programming status.  As defendant Warden Virga has explained, only inmates in cell

5     blocks 5-8, where the incident occurred, and belonging to the racial groups involved in the assault,

6     were placed on that modified programming.  (Doc. No. 21-6, ¶ 14 at 5.)  African-American and

7     Hispanic inmates in other cell blocks within Facility C, and inmates of other racial groups, were

8     not subject to modified programming.  (Id.)  As confidential interviews and cell searches were

9     conducted and intelligence was gathered by prison officials, as detailed above, defendant Warden

10    Virga determined that throughout the fall of 2010 there remained a high risk of violence if

11    African-American and Northern Hispanic inmates in blocks 5-8 of C-facility were returned to

12    normal programing.  (Id., ¶ 32 at 8.)  That potential for violence was determined not to be between

13    specific individuals or disruptive groups, but between two racial groups - African-Americans and

14    Northern Hispanics.[5]  (Id.)  By November of 2010 the scoring system developed by defendants

15    was resulting in the lifting of the modified program restrictions for effected African-American

16    inmates found to be in the low-risk category.  (Id., ¶¶ 35-36 at 9.)

17                 Through the spring of 2011, prison officials continued to receive information

18    which indicated that the conflict between Northern Hispanic and African-American inmates

19    associated with the Crips and Bloods remained ongoing.  (Id., ¶¶ 39-44 at 10-11.)  As intelligence

20    was obtained by prison officials indicating that Crips and Bloods inmates were willing to program

21    peaceably, those inmates were released to normal programming.  (Id., ¶ 44-45 at 11.)  However,

22    Northern Hispanics who remained unwilling to program peaceably according to intelligence

23    gathered by prison officials, were retained on modified programming and eventually were

24   _____

25           [5]  Defendant Warden Virga explains that Southern Hispanics were not placed on modified
      programming because, in his experience, Southern Hispanic inmates did not act in solidarity with
26    Northern Hispanic inmates.  (Doc. No. 21-6, ¶ 14 at 5.)

transferred to other institutions in August of 2011.  (Id., ¶ 44-45 at 11.)  Under the scoring system developed by defendants, plaintiff was placed in the high-risk category because he is a Crip inmate and had a history of prison violence prior to the September 7, 2010 incident reflected in his record.  (Id., ¶ 46 at 11.)

Plaintiff does not explain in what way the modified programming employed by defendants could have been more narrowly tailored.  Instead, he merely makes broad and unsupported assertions that the division of prisoners along racial lines is the creation of prison officials rather than that of the prisoners themselves, that defendant Warden Virga has provided the court with false information, and that the modified programming employed here was unsuccessful in promoting inmate safety and prison security.

Plaintiff also disputes his "risk-score" and contends that the prior May 3, 2010 incident in which he was involved should not have been relied upon in his scoring because it does not reflect a history of engaging in violence on his part.  In support of this contention plaintiff has submitted a copy of the rules violation report charging him with participation in a riot in connection with that May 3, 2010 incident.  (Doc. No. 34-4 at 92-99.)  That report reflects that plaintiff pled not guilty to that disciplinary charge and argued that he was not actively engaged in the fight that involved at least nine other inmates.  (Id. at 92.)  One of the participants in the fight testified at plaintiff's disciplinary hearing that plaintiff was merely attempting to break up a fight between the witness and another inmate.  (Id. at 93.)  Nevertheless, plaintiff was found guilty of the prison disciplinary charge and his appeal at the second level of review was denied with it being noted that he failed to comply with staff orders to get down to the ground during the altercation, that correctional officers had to use pepper spray to subdue him, and that plaintiff was charged with  participating in a riot rather than merely for fighting.  (Id. at 99.)

After consideration of all the arguments and evidence submitted by the parties on summary judgement, the undersigned finds that defendants have carried their burden of showing that the modified programming they employed in this instance was narrowly tailored to its proper

1  purpose.  The modified program was not applied to all African-American inmates at CSP-

2  Sacramento.  See Haynes, 2012 WL 6005701 at *8 (denying defendants' motion for summary

3  judgment in a case involving a claim similar to plaintiff's because the evidence before the court in

4  that case indicated that defendants had placed entire racial groups on modified programming and

5  because plaintiff, who was unaffiliated with any gang or disruptive group within the prison and

6  had not instigated a violent incident, had more in common with prisoners who were not subjected

7  to the modified programming than with those that were).  Here, the modified programming

8  employed by defendants was limited to African-American inmates who were housed only in cell

9  blocks 5-8 of C Facility, where the September 7, 2010 inmate assault took place.  As the

10 defendants' scoring system was implemented, African-American inmates were released back to

11 normal programming. As to those inmates who remained on modified programming, that decision

12 was based on individual factors, such as history of violence, age, geographic background, and

13 affiliation with gangs or other disruptive groups within the prison.

14         Thus, the modified programming employed by defendants in this case  was not

15 applied arbitrarily.  Rather, it was narrowly tailored and limited in its impact to a subset of

16 African-American inmates who were housed where the precipitating inmate assault occurred and

17 were individually considered to present a high-risk of violence.  See LaBranch v. Yates, No. 1:09-

18 cv-0048-AWI-JLT (PC), 2012 WL 3838380, at *12 (E.D. Cal. Sept. 4, 2012) (recommending

19 grant of summary judgment for defendants where modified program decisions in response to

20 threatened violence among inmates associated with various gangs were made "on an inmate-by

21 inmate basis, rather than by ethnicity, demonstrat[ing] the narrow tailoring of the officials'

22 actions."); Corona v. Harrington, No. CV F 08-0237 LJO DLB, 2010 WL 318555, at *7 (E.D.

23 Cal. Jan. 20, 2010) (granting dismissal of equal protection claim because the plaintiff could not

24 show discriminatory intent when only a small subset of inmates in plaintiff's racial group were

25 retained on modified programming while others of his racial group had been released to normal

26 programming).

1        Here, plaintiff does not dispute that he is a Crip inmate and that his past involves

2   participation in a May 2010 inmate altercation.[6]  Moreover, the continued imposition of the

3   modified programming was justified by information obtained by correctional staff and incidents

4   indicating on-going tensions between the African-American and Northern Hispanic inmates in cell

5   block 5-8.  Although plaintiff disputes defendants' interpretation of and reliance on information

6   gathered by prison officials demonstrating that on-going tension, plaintiff offers no evidence to

7   support his assertions that defendants are lying and/or misleading the court in that regard.

8        There is also no evidence before the court on summary judgment suggesting that

9   the defendants delayed in releasing African-American inmates from modified programming.

10  Rather, the evidence presented by defendants that prison staff continued to receive information

11  indicating that the conflict between Northern Hispanic and African-American inmates was

12  ongoing is unrefuted by plaintiff.  The court finds that plaintiff has not established a genuine issue

13  of disputed material fact as to whether the modified programming employed was sufficiently

14  narrowly tailored.

15       For all of these reasons, defendants motion for summary judgment in their favor

16  should be granted with respect to plaintiff's equal protection claim.

17  **II.  Defendant Baker**

18       As noted above, counsel for defendants also argues that the evidence on summary

19  judgment  establishes that defendant Baker was not part of the CSP-Sacramento executive staff,

20  did not have authority to impose, modify or end the modified programming, and did not determine

21  the schedule by which the impacted inmates would return to normal programming.  (Doc. No. 21-

22  6, ¶ 47 at 12.)  Plaintiff disagrees with that characterization, asserting that defendant Baker had

23  the authority to impose, modify or end the modified program because of her position as a

24  _____

25       [6]  As noted above, although plaintiff asserts that in connection with the May 3, 2010
    incident he was merely trying to break-up a fight, that disciplinary incident was a serious one
    considering the large number of inmates involved, plaintiff's failure to comply with orders by

26  correctional staff to get down and the necessity of the use of pepper spray to subdue him.

1   correctional lieutenant.  (Doc. No. 34 at 18-19 & Doc. No. 34-4, ¶26 at 7.)

2                 In order to be liable a defendant must be involved in some affirmative act that

3   causes the constitutional deprivation alleged in a § 1983 action.  Johnson v. Duffy, 588 F.2d 740,

4   743 (9th Cir. 1978).  Here, defendants Warden Virga and Capt. Shannon concede their

5   involvement in the actions about which plaintiff complains.  However, defendant Baker has

6   submitted evidence that she was not involved in the complained of actions - the imposition and

7   maintaining of the challenged modified programming.  Plaintiff has come forward with no

8   contrary evidence to raise a triable issue of material fact in this regard.  Indeed, plaintiff's own

9   exhibits confirm that it was defendant Capt. Shannon, not defendant Lt. Baker, who issued the

10   several memoranda to correctional staff concerning the modified programming covering the

11   period from July 27, 2010 to June 20, 2011.  (Doc. No. 25 at 49-55 & 66-83.)

12                 The court concludes that based upon the evidence presented on summary

13   judgment, it is undisputed that defendant Baker was not involved in the decisions concerning the

14   modified programming employed by prison officials in response to the September 7, 2010 inmate

15   attack.  Accordingly, summary judgment should be granted in favor of defendant Baker as to

16   plaintiff's equal protection claim on this ground as well.

17   **III. Plaintiff's Assertion of Additional Claims**

18                 As noted above, plaintiff now insists in his opposition and supplemental opposition

19   to the pending summary judgment motion that in addition to a claim that the defendants violated

20   his right to equal protection under the law, his complaint also includes the related claims that as a

21   result of defendants' actions he was unlawfully:  denied due process, denied adequate medical

22   care, denied of access to the law library, denied access to the courts, denied religious services,

23   denied adequate lighting, denied outdoor exercise, and subjected to cruel and unusual punishment.

24                 Plaintiff, proceeding pro se, filed his four-page complaint on July 12, 2011.  (Doc.

25   No. 1).  Plaintiff stated his single claim, without identifying the constitutional basis therefore, and

26   the facts in support thereof on only two of those four pages.  (Id. at 3-4.)  Therein, he complained

1   of himself and "black inmates in blocks 5 thru (sic) 8" being placed on a "SHU program"

2   following the September 7, 2010 inmate attack.  (Id. at 3.)   Plaintiff also complained of still being

3   held in that modified program status despite his efforts to be transferred to another cell block and

4   asked that the court stop the defendants "from placing me and other inmates on lockdowns that

5   are of the same black race[.]" (Id.)  Although plaintiff mentioned in his complaint the conditions

6   of his modified program ("no yard, telephone calls, visits, religious services, canteen, packages or

7   property, NA/AA or Men's Group, or no access to the Legal Library and no work or education,

8   and showers three times a week") and asked for "[r]emoval of the white paint off the back cell

9   windows," the focus of his single claim clearly appeared to be that he had been improperly placed

10  on a modified program by defendants due to his race.  (Id.)

11          On July 28, 2011, the court screened plaintiff's complaint, found that it stated a

12  cognizable claim and authorized service of process.  (Doc. No. 5.)  On July 11, 2012 defendants

13  moved for summary judgment, arguing that the modified program employed by defendants in

14  response to the September 7, 2010 inmate attack did not, under the undisputed facts, violate

15  plaintiff's right to equal protection under the law.  (Doc. No. 21.)  In his opposition to that motion

16  for summary judgment filed August 13, 2012, plaintiff again focused on equal protection as the

17  basis for his claim.  (Doc. No. 25.)  It is true, however, that plaintiff at that time also referred to

18  his case as being one based upon "the denial of procedural due process," denial or proper medical

19  care," "denial of access to the courts," lack of lighting and sunlight, lack of outdoor exercise and

20  other conditions of confinement.  (Id. at 2-3.)  Plaintiff's complaint, however, fails to allege

21  adequate facts in support of any type of cruel and unusual punishment claim under the Eighth

22  Amendment, any denial of access to the courts claim or any procedural due process claim.

23          Nonetheless, in light of these unusual circumstances and out of an abundance of

24  caution, the undersigned will recommend that plaintiff be granted leave to file an amended

25  complaint in an attempt to present claims other than the equal protection claim addressed above.

26  See Weilburg v. Shapiro, 488 F.3d 1202, 1205 (9th Cir. 2007) ("Dismissal of a pro se complaint

24

1  without leave to amend is proper only if it is absolutely clear that the deficiencies of the complaint

2  could not be cured by amendment."); Ramirez v. Galaza, 334 F.3d 850, 861 (9th Cir. 2003)

3  ("Leave to amend should be granted unless the pleading 'could not possibly be cured by the

4  allegation of other facts,' and should be granted more liberally to pro se plaintiffs.") (quoting

5  Lopez v. Smith, 203 F.3d 1122, 1130-1131 (9th Cir. 200) (en banc)) .

6          If this recommendation is adopted, plaintiff will be granted leave to amend only to

7  attempt to state cognizable claims alluded to in his original complaint, excluding his equal

8  protection claim addressed above, and only against defendants Virga, Shannon and Baker who

9  have been named in this action.  In addition, if this recommendation is adopted and leave to

10  amend granted, the assigned Magistrate Judge will issue an order advising plaintiff of the date by

11  which any amended complaint must be filed, the requirements governing any amended complaint

12  he may elect to file and of the legal standards governing the other constitutional claims he has

13  alluded to in his opposition to the pending motion for summary judgment.[7]

14                                   **CONCLUSION**

15          In accordance with the above, IT IS HEREBY RECOMMENDED that:

16          1. Defendants' June 11, 2012 motion for summary judgment (Doc. No. 21) be

17  granted as to plaintiff's claim that his constitutional right to equal protection under the laws was

18  violated; and

19          2. Plaintiff be granted leave to file an amended complaint to attempt to allege the

20  other constitutional claims, if any, he wishes to pursue against defendants Virga, Shannon and

21  Baker.

22

23          [7]  However, plaintiff is forewarned that in order to proceed on any additional claims it is
    required that  he exhausted his administrative remedies with respect to those claims prior to
24  commencing this action.  See 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001);
    Rhodes v. Robinson, 621 F.3d 1002, 1005 (9th Cir. 2010).  Moreover, compliance with this
25  mandatory statutory requirement is not achieved by exhausting existing claims during the course
    of an action.  See Rhodes, 621 F.3d at 1004 (citing McKinney v. Carey, 311 F.3d 1198, 1199
26  (9th Cir. 2002)).

1        These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

3   days after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6   shall be served and filed within seven days after service of the objections.  The parties are advised

7   that failure to file objections within the specified time may waive the right to appeal the District

8   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9   DATED: February 27, 2013.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:4
thor1826.msj